65 So.2d 903

**STATE v. JACKSON.**

No. 41204.

June 1, 1953.

Rudolph F. Becker, Jr., New Orleans, for defendant-appellant.

Fred S. LeBlanc, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Severn T. Darden, Dist. Atty., and Phil Trice, Asst. Dist. Atty., New Orleans, for appellee.

LE BLANC, Justice.

The defendant, Eddie Jackson, was convicted by a jury on July 16, 1952, of the crime of having murdered one Frances Foster on January 6, 1952. He vainly attempted to obtain a new trial and on January 13, 1953, was sentenced to death by electrocution by the trial judge. He obtained and is now prosecuting this appeal from his conviction and sentence.

During the trial of his case four bills of exception were reserved, all of which are now presented before us for consideration.

Bill of Exception No. 1 was reserved to the overruling of an objection to a question propounded to the Assistant Coroner, Dr. J. H. McCormick, Jr., who had performed an autopsy on the body of the deceased victim of the murder. The question propounded and which was objected to was the following: "At the time you performed your autopsy on this particular body, did the body bear any kind of tag on it?" The record shows the objection to have been stated as follows: "Mr. Becker: 'I object to that.'"

Bill of Exception No. 2 was reserved to the Judge's overruling of an objection to the admissibility of an alleged written confession made by the accused. The objection was based on the proposition that the confession could not be offered and admitted in evidence before convincing proof of the corpus delicti had been made.

Bill of Exception No. 3 was reserved to the overruling of an objection made when the State offered in evidence a spent shotgun shell found at a spot between the scene of the crime and the police headquarters, nearby, where the defendant went to surrender after the shooting.

Bill of Exception No. 4 was reserved to the overruling of defendant's motion for a new trial.

The first two bills involve the question of proof of the corpus delicti and inasmuch as the testimony taken in connection with both has been made a part of the record and they both seem to have some connection, we think it proper to relate the facts and circumstances under which this homicide took place in order to better consider and dispose of them.

The facts are that the accused and Frances Foster had been living together as man and wife at 718 So. White Street in the city of New Orleans for quite a long time. On Christmas Day of 1951 they had a disagreement and the accused moved out of the house and went to live next door in a house which bore Municipal No. 720 So. White Street.

The decedent continued to live in the house at 718 So. White Street with her stepfather, one Joseph Shiloh, and her daughter, Dora Tadlock, aged 13. In the afternoon of December 31, 1951, Dora Tadlock saw the accused when he came to the house where he lived, carrying a

long box. Later that evening he went to the house where Frances Foster lived and before talking to her mother he asked her daughter to leave but the girl's mother objected to her going and she remained and heard him ask her mother to return to him. The Foster woman refused and he then threatened to kill her if she persisted in refusing his request.

On Sunday evening January 6, 1952, Joseph Shiloh and Frances Foster left their house to go to Church. At about 7:25 they were standing on the sidewalk waiting to be joined by Shiloh's wife. While they were standing there Shiloh heard the report of a shotgun which had been fired at the Foster woman from the direction of an alleyway between the two houses. The shot struck the Foster woman in the head, penetrated her brain and caused her death. Shiloh saw the blast from the gun when he heard the shot. He saw Frances Foster fall and he continued to look in the direction from which the gun had been fired, fearing there might be another shot coming. Almost instantaneously he saw Eddie Jackson the defendant, whom he knew well, run from the alley carrying a single barrel shotgun. At the same time he began to call in a loud voice for help.

He remained on the scene until an ambulance arrived and the woman was pronounced dead, whereupon the police took him away to hear his statement.

While this was going on Eddie Jackson proceeded to the Criminal Court Building on Tulane Avenue, less than two blocks away, and walked into the Radio Room just as the dispatch officer was broadcasting his description. He was still carrying the shotgun and this caused the officer to draw his own gun and call for assistance before he saw that the shotgun was "broken" and the accused was making no hostile demonstration. The Officer then took the shotgun from him and in searching him found four green shotgun shells labeled 00 buckshot.

Shortly thereafter other policemen arrived and two of them took the accused with them in an automobile to the scene of the crime. They stopped where they could see the body of the deceased woman and the accused remarked, "That's her. That's just the way I want her".

One of these officers remained at the scene while the other, accompanied by still another officer, took the accused back to the Criminal Court Building. The officer who remained took a flash light and retraced the path which the accused had taken from the scene and, near 723½ Jane Alley, which is behind 718 So. White Street and between this house and the Criminal Court Building, he found an empty green shotgun shell identical in every way to those found on the person of the accused, except that it had been fired.

An Assistant District Attorney was called and on confronting the accused asked

him if he had been mistreated. The accused replied that he had not. The District Attorney then interrogated him and he answered all questions asked freely and voluntarily. His answers were then put in a narrative form in a typewritten statement. The statement was then read by the accused and signed by him. That is the confession, the introduction to which objection was made and Bill of Exception No. 2 reserved.

The body of Frances Foster was removed from the scene and taken to the morgue. In accordance with the custom which prevails in such cases a tag with the name "Frances Foster" was placed on one foot of the body. The following morning the assistant coroner performed an autopsy on the body of a Negro woman bearing such tag. He found and extracted from the brain two pellets which appeared to him to be buckshot. The two pellets described by him were shown to be similar in size and shape to the pellets removed in the court room by the district attorney from one of the four shells that had been taken from the defendant's person. The doctor's testimony was that death was practically instantaneous. The body of the deceased woman was taken to the home of Joseph Shiloh where a wake was held and he and Dora Tadlock both testified that they saw it and subsequently attended her funeral.

■ Regarding Bill of Exception No. 1 which was reserved to an objection to the testimony of the assistant coroner, it is observed that no ground of objection was stated by counsel. The question objected to was whether or not, at the time the autopsy was performed, the body bore any kind of tag on it and the objection as stated was simply "I object to that." It now develops from the bill of exception prepared by counsel that the objection was based on the ground that any answer that would have been given to the question would have been hearsay testimony. Granting for the sake of the argument that hearsay was the basis of the objection, it is manifest that the answer to be elicited from the question would not have been hearsay testimony as the doctor was only asked to testify whether or not the body on which he performed the autopsy bore any kind of tag on it and obviously he was in a position to state from his own knowledge whether that was a fact or not.

There might have been merit to the objection had the testimony sought to be brought out been offered for the purpose of identifying the body as that of Frances Foster merely because the tag which it bore had the name Foster written on it. As the doctor admits he did not know who had placed the tag on the body nor did he know who had written the name "Frances Foster" on the tag. But he certainly could testify that he saw such tag on the body without that being hearsay testimony.

■ When the testimony concerning the tag is considered in connection with several other facts and circumstances of the

case, especially the one that it was known that Frances Foster had been shot in the head the night before, that it is the custom to attach an identifying tag to a corpse that is taken to the morgue and that the body on which Dr. McCormick performed his autopsy was the only one on which an autopsy had been performed that day, we believe that the testimony was relevant and was competent proof of the corpus delicti in this case. As was correctly stated by the trial judge in his per curiam on this bill: "It is obvious that the tag placed on the body containing the name Frances Foster, was placed there to identify it from any other female body then in the morgue, and was placed upon the body by some attendant in the coroner's office, who was no more conversant with the identity of the body than the coroner. At no time did the autopsy surgeon ever say he identified this body as that of Frances Foster, a person he knew in life. Proof as a whole satisfied the jury beyond a reasonable doubt that it was the body of Frances Foster named in the indictment. The Court was also satisfied on this score and for the same reason."

Aside from this, if the sole objection made to this testimony relating to this tag was to support the contention that no convincing proof of the corpus delicti had been made, it would seem to avail the defendant absolutely nothing for the reason that the testimony disclosed several facts otherwise which could leave no doubt in the minds of the jury, as evidently it did not, that Frances Foster was the person who had come to her death at the hands of this accused by means of a shotgun fired at her head. The facts, as already related, produced the necessary proof and if they needed any further corroboration it certainly was found in the written confession signed by the accused which, it is conceded, was voluntarily and freely given.

■ The admission of this confession which forms the basis of the second bill of exception was introduced after all these facts had been given and it can hardly be said, therefore, that it was sought to be admitted before proof that the corpus delicti had been made. As far as this case is concerned, therefore, the objection presents purely an academic question which this Court is not disposed to rule on.

We are firmly of the opinion that the trial judge correctly overruled defendant's objection to the question propounded to the pathologist who performed the autopsy on the decedent's body and that his ruling on the admission of defendant's confession was also proper and consequently find no merit in either bill of exception No. 1 or No. 2.

■ Bill of Exception No. 3, as previously pointed out, had reference to the ruling of the trial judge on an objection of counsel for defendant to the admission of testimony by the state regarding a spent shotgun shell, and the offer of the shell itself in evidence. This shell was found by one of the investigating police officers

at a point between the scene of the crime and police headquarters where the accused went to surrender after the shooting.

The objection was based on the contention that the state had not shown any connection between the empty cartridge that had been found and the gun which was produced at the trial as the gun from which the fatal shot had been fired.

It is pertinent to observe in this connection that the accused, in his signed confession, among other matters stated: "After I shot her I kicked the empty shell out and walked to the building on Tulane Avenue and Broad * * *," that being the Criminal Court Building where he went to surrender to the police officers. The officer who found and identified the empty shell, having initialed it, testified that he had found it on the path taken by the defendant from the scene of the shooting to the Criminal Court Building. That was within a few minutes of the shooting. The shell was shown to be of the same caliber, gauge, color and description as the four shells identified as having been turned over by the defendant to the police officer to whom he surrendered and it was shown to fit the gun with which the deceased was killed. Clearly, therefore, there was a sufficient connection between this piece of evidence and the weapon which was the agency of the crime. There was no error committed by the trial judge in admitting the testimony and the shell in evidence.

Bill of Exception No. 4 was reserved, as already stated, to the overruling by the trial judge of the defendant's motion for a new trial. It raises no questions not covered and presented by the three other bills already disposed of and merits no further comment.

For these reasons the conviction and sentence are affirmed.

FOURNET, C. J., absent.